UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SARA P. CHIAVEROTTI,
Executrix of the Estate of
MATTHEW R. CHIAVEROTTI, deceased,
GARLAND L. ALEXANDER,
MICHELLE M. GALLINA,
Executrix of the Estate of
MATTHEW A. GALLINA, deceased,
DANIEL M. KELLOGG,
JOHN F. PACE,
JOSHUA S. XENAKIS,
JOSEPH H. ALBERT.

      Plaintiffs,

v.

3M COMPANY, et al.,

      Defendants.

Case No. 2:25-cv-00232

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO REMAND

COMES NOW Plaintiffs Sara P. Chiaverotti, Executrix of the Estate of Matthew R. Chiaverotti, deceased; Garland L. Alexander; Michelle M. Gallina, Executrix of the Estate of Matthew A. Gallina, deceased; Daniel M. Kellogg; John F. Pace; Joshua S. Xenakis; and Joseph H. Albert, (collectively, the "Chiaverotti Plaintiffs" or "Plaintiffs"), who respectfully move this Honorable Court to remand this matter back to Virginia state court in the Virginia Beach Circuit Court for all further proceedings. Plaintiff also requests this Court grant payment from Defendants Honeywell International Inc. and Honeywell Safety Products USA, Inc. (together, "Defendant

Morning Pride") for all just costs and expenses, as this action was improperly removed to federal court in the absence of proper subject matter jurisdiction.

## PRELIMINARY STATEMENT

The Chiaverotti Plaintiffs are current and retired firefighters who served the cities of Portsmouth and Virginia Beach, alongside the two spouses of deceased firefighters who both served the City of Virginia Beach.

Plaintiffs brought suit alleging claims for breach of express and implied warranties, as well as negligence and gross negligence, following their various exposures to per- and polyfluoroalkyl substances ("PFAS"). PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to resist and repel oil, stains, heat, and water. These "forever chemicals," as they are colloquially known due to their immunity from degradation, bioaccumulate in humans, causing serious adverse health effects, including cancer. For Plaintiffs, they were exposed to these "forever chemicals" through the protective clothing specifically designed for, and worn by, firefighters (known as "turnouts"). These turnouts were manufactured, designed, sold, supplied, and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries, resulting in the Plaintiffs' development of various cancers, and, for some, their death. Among the turnouts worn by Plaintiffs included Morning Pride-branded turnouts, manufactured by Defendants Honeywell International Inc. and Honeywell Safety Products USA, Inc.[1]

---

[1] See ECF No. 1-1 at 67 (Pls.' Am. Compl. ¶¶ 23, 25-27). Defendant Morning Pride alleged in their Notice of Removal that the "Amended Complaint does not allege . . . whether [Plaintiffs] ever wore Morning Pride turnout gear." ECF No. 1 at ¶ 4. **This is false.**

Plaintiffs' Complaint does not set forth any federal issues or causes of action nor does complete diversity exist between the parties. Moreover, federal officer jurisdiction is improperly asserted and does not exist in this context. Thus, federal subject matter jurisdiction is lacking and this matter must be remanded to Virginia Beach Circuit Court.

## PROCEDURAL BACKGROUND

On April 12, 2024, the Chiaverotti Plaintiffs filed their initial Complaint in this action in the Circuit Court for the City of Virginia Beach. At the time of filing, decedent Matthew Gallina was alive and undergoing treatment for advanced esophageal cancer. Unfortunately, in August 2024, after the commencement of this litigation, Plaintiff Gallina died from his cancer. Accordingly, on March 24, 2025, without objection from Defendants, Plaintiffs sought to leave to amend Plaintiff Gallina's causes of action to permit his claims to continue despite his death. Plaintiffs also sought leave to amend their Complaint to remove certain defendants and allegations related to a specific PFAS chemical, known as Class B Foam, to improve precision and clarity.

At that same time, on March 24, 2025, Plaintiffs filed a series of Motions for Voluntary Nonsuit, seeking to nonsuit all such Defendants removed from Plaintiffs' suit by way of the Amended Complaint. The Virginia Beach Circuit Court granted all of Plaintiffs' Motions on March 25, 2025.

On April 16, 2025, Defendant Morning Pride filed a Notice of Removal to this Court, claiming that removal was proper under the federal officer statute, 28 U.S.C. § 1442(a)(1). ECF No. 1. Plaintiffs hereby bring the following Motion to Remand, as no federal subject matter jurisdiction exists, so as to make Defendant's removal of this action improper.

## LEGAL STANDARD

Cases may be removed from state court to federal court when original jurisdiction lies in the federal district courts.  28 U.S.C. § 1441(a).  The burden of establishing federal jurisdiction is placed upon the party seeking removal.  Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921) (citing Carson v. Dunham, 121 U.S. 421, 425 (1887)).  Generally, district courts have original jurisdiction in diversity cases and/or cases that arise out of a "federal question." 28 U.S.C. § 1331; 1332(a).  Diversity exists when the matter in controversy exceeds $75,000 and is between citizens of different states.  Id. at § 1332(a).  A corporation is treated as a citizen of the state of incorporation and the state where it has its principal place of business.  28 U.S.C. § 1332(c)(1).

Congress has imposed limits on removal to show that it did not intend to allow all defendants an unqualified right to remove.  Home Depot U.S.A., Inc. v. Jackson, 139 S. Ct. 1743, 1749 (2019).  For example, a case that is otherwise removable based on diversity jurisdiction is not removable if any of the defendants properly joined and served are citizens of the forum state. 28 U.S.C. § 1441(b)(2).  See, e.g., Linnin v. Michielsens, 372 F. Supp. 2d 811, 816 (E.D. Va. 2005); Hurley v. Motor Coach Indus., 222 F.3d 377, 380 (7th Cir. 2000); Roche v. Lincoln Prop. Co., 373 F.3d 610, 620 (4th Cir. 2004) (cases discussing the forum-defendant rule).

Another, less-traditional pathway into federal court is through the federal officer removal statute, which permits a "person" to remove a civil action that was commenced against an "officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  § 1442(a)(1) was created to protect federal officers "when particular litigation implicates a cognizable federal interest."  Gov't of P.R. v. Express Scripts, Inc., 2024 U.S. App.

LEXIS 26384, at *15 (1st Cir. Ct. App. October 18, 2024) (quoting Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 487 (1st Cir. Ct. App. 1989)).

For a private defendant to assert jurisdiction under § 1442(a)(1), the defendant must show: (1) that it "acting under" a federal officer; (2) that it had a "colorable federal defense"; and (3) that the conduct at issue was carried out for, or in relation to, the asserted official authority of the federal government (a.k.a. "under color of [federal] office"). Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 254 (4th Cir. 2017) (internal citations omitted); Issacson v. Dow Chem. Co., 517 F.3d 129, 135 (2008).

The Defendants still bear the burden of establishing proper federal jurisdiction under § 1442(a). Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021).

Beginning with the first prong, it is true that courts have interpreted "acting under" broadly, allowing federal officer jurisdiction to be "liberally construed" in favor of removal, see ECF No. 1 at ¶ 45, *but* "broad language is not limitless[,] [a]nd a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." Watson v. Phillip Morris Cos., 551 U.S. 142, 147 (2007). The United States Supreme Court has interpreted this to only authorize private parties to assert § 1442(a) removal jurisdiction "if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law.'" Id. at 151 (quoting City of Greenwood v. Peacock, 284 U.S. 808, 824 (1966)).

For a private person to be "acting under" a federal officer, the actions at issue in the litigation sought to be removed "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." Id. at 152 (citing Davis v. South Carolina, 107 U.S. 597, 600 (1882))

(emphasis in original). <u>See also</u> <u>Sawyer</u>, 860 F.3d at 255 ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.") (emphasis in original).

The second prong requires that the Defendants raise a "colorable" federal defense. <u>See, e.g.</u>, <u>Sawyer</u>, 860 F.3d at 254; <u>Issacson</u>, 517 F.3d at 138; <u>Mesa v. California</u>, 489 U.S. 121, 132-34 (1989). This requires that Defendants raise a claim that is "defensive" and "based in federal law." <u>Mesa</u>, 489 U.S. at 129-30. While Plaintiffs agree that the government contractor defense has been recognized as a colorable federal defense, <u>see</u> ECF No. 1 at ¶¶ 65-67; <u>see also, e.g.</u>, <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500, 512 (1988), Plaintiffs do not agree that Defendant Morning Pride is a "contractor" to whom this defense should extend.

Finally, the third prong requires Defendants to show that the acts complained of were taken under "color of [federal] office." 28 U.S.C. § 1442(a)(1). For non-governmental defendants, this means that the entity must show that the acts for which it is being sued occurred *because of* what it was asked to do by the federal government. <u>Issacson v. Dow Chem. Co.</u>, 517 F.3d 129, 137 (2d Cir. 2008). Put differently, Defendants must establish that the acts sued-upon occurred *while Defendants were performing their official duties*. <u>Id</u>.

## ANALYSIS

Defendant Morning Pride has claimed they are a "federal officer" by attempting to connect a series of unrelated events, none of which properly establish jurisdiction under § 1442(a). According to Defendant's theory, as posited in their Notice of Removal, this Court should find them to have acted under federal authority, when:

1. Advisory, non-federal guidelines were created governing "safety codes and standards for fire, electrical, and building safety[,]" which included "performance standards" for turnout gear[2];

2. Defendant Morning Pride manufactured turnout gear in accordance with these industry standards[3];

3. An unrelated, unnamed distributor company *then* contracted with the City of Virginia Beach to provide turnouts to the Virginia Beach Fire Department[4];

4. Defendant Morning Pride *then* sold, or otherwise distributed, their industry-standard gear to this unrelated, unnamed distributor[5];

5. The City of Virginia Beach *then* purchased this Morning Pride-branded turnout gear from the unnamed distributor using money *potentially* provided, in part, by a federal grant program (which, notably, did not require turnouts to be purchased from any specific company nor brand)[6];

6. Additionally, at some other point in time, potentially decades prior to the City's purchase of any Morning Pride-branded gear, *and wholly unrelated both to their purchase of any specific turnout gear and any contract with the unnamed*

---

[2] ECF No. 1 at ¶ 18

[3] ECF No. 1 at ¶ 15 ("These fabrics have been tested and certified to meet industry standards.").

[4] ECF No. 1 at ¶¶ 16-17. <u>See also</u> ECF No. 1 at ¶ 57 ("[T]he City of Virginia Beach and the Virginia Beach Fire Department contracted with a Morning Pride Distributor.").

[5] "Morning Pride primarily sells its gear through distributors, which often contract with fire departments and municipalities. Upon information and belief, the Virginia Beach Fire Department and the Portsmouth Fire Department purchased, through a Morning Pride distributor, . . . Morning Pride turnout gear." ECF No. 1 at ¶¶ 16-17. <u>See also</u> ECF No. 1 at ¶ 57 ("[T]he distributor then procured this gear from Morning Pride through a distribution agreement.").

[6] ECF No. 1 at ¶¶ 31-32.

*distributor*, the City of Virginia Beach contracted with the United States Military to provide firefighting services to various military bases[7];

7. Thus, at some point in time, some Virginia Beach firefighters, *maybe* including Plaintiffs, *may* have provided firefighting services to the military under these independent contracts, and *may* have been wearing Morning Pride-branded turnout gear while doing so.[8]

After this attenuated, drawn-out game of 'Connect the Dots,' Defendant Morning Pride asks this Court to consider them a "federal officer" – despite Defendant having never entered into any contract or agreement with the City of Virginia Beach, the City of Portsmouth, the U.S. Military, the U.S. Government, or any specific fire department involved in Plaintiffs' suit.  At most, Defendants' relation to federal authority starts and ends with their compliance with the product standards used by a federal funding program instituted to aid local fire departments – a connection too insignificant to give rise to federal officer jurisdiction.  Despite § 1442(a)(1)'s liberal standard, Defendant's argument clearly fails both the first and the third requirement underlying federal officer removal.

Since Defendant Morning Pride fails to meet the first and third prongs, this Court need not address the second prong of § 1442(a)(1), related to a colorable federal defense, though Plaintiff contends that Defendant has not articulated a applicable federal defense.  As Defendant lacks any other grounds for federal jurisdiction, given that the parties are not properly diverse to satisfy 28

---

[7] ECF No. at ¶¶ 34.

[8] ECF No. 1 at ¶ 41.  It is worth noting that these contracts do not involve the City of Portsmouth.

U.S.C. § 1332(a)[9], nor is there any federal question at issue, this matter must be remanded back to Virginia state court.

**A. Defendant Morning Pride was not "Acting Under" a Federal Officer When It Provided Turnouts to a Distributor, Who, In Turn, Provided Turnouts to Virginia Beach and/or Portsmouth.**

The removal statute's "'basic' purpose is to protect the Federal Government from the interference with its 'operations' . . . [since] [s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." Watson v. Phillip Morris Cos., 551 U.S. 142, 150 (2007). In examining the first prong of § 1442(a), the Supreme Court has found that, where a private person "acts as an assistant to a federal official[,]" or, in other words, "assists" a federal officer "in the performance of his official duty[,]" some of these same considerations apply. Id. (quoting Davis v. South Carolina, 107 U.S. 597, 600 (1882)). In this context, then, "acting under" must refer to "what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to **one holding a superior position or office.'**" Id. at 151 (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)).

Taken together, the history and precedent set by the Supreme Court are clear: § 1442(a) *only* applies to private parties when they were "authorized to **act with or for** [federal officers or agents] in **affirmatively executing duties** . . . under federal law." Id. (quoting City of Greenwood v. Peacock, 384 U.S. 808, 824 (1966)) (emphasis added).

*a. Defendant Morning Pride's Compliance with the National Fire Protection Association's Standards (the "NFPA 1971") Does Not Amount to "Acting Under" A Federal Officer or Agency.*

---

[9] Defendant Bradsden Solutions, Inc. and Blue Ridge Rescue Suppliers, Inc. are Virginia stock corporations, thus also barring removal to federal court pursuant to the Forum Defendant Rule.

Defendant Morning Pride claims they were "acting under" a federal officer by selling their NFPA-compliant[10] turnout gear to local fire departments via a distributor.[11]  Specifically, the "federal officers" Defendant contends they were "acting under" *when they manufactured and distributed PFAS-containing turnout gear* were the Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA").  According to Defendant Morning Pride, they were "acting under" FEMA's control by designing turnouts that complied with the NFPA 1971 – all because DHS/FEMA's joint funding program, the Assistance to Firefighters Grant Program ("AFG"), required that turnout gear purchased using grant funding comply with the NFPA 1971, and, Virginia Beach was, at various times, provided federal grant funding under the AFG.[12]

Here, the claims by Defendant Morning Pride that "FEMA exerted 'subjection, guidance, or control' . . . by specifying precise design specifications for the turnout gear at issue" are false, and as such, are wholly irrelevant to any argument for jurisdiction under § 1442(a)(1).[13]  Why? Because FEMA did not provide specific design specifications to Defendant, or any turnout manufacturer, nor did FEMA require turnout manufacturers, like Defendant, to follow any specific design specifications – Instead, Defendant's argument rests on the AFG Program's requirements,

---

[10] The NFPA 1971 Standard on Protective Ensembles for Structural Firefighting and Proximity Firefighting were the widely recognized uniform performance standards set forth by a nonprofit, **non-governmental** organization, the National Fire Protection Association.

[11] See ECF No. 1 at ¶ 49 ("[I]n completing these sales, Morning Pride was acting under a federal officer.").

[12] Note that there is no evidence or proof offered thereof that the turnout gear actually worn by Plaintiffs (and therein causing their complained-of injuries) were acquired using AFG funding nor any evidence or proof that any Morning Pride-branded gear was ever purchased by the City of Virginia Beach using AFG funding.

[13] ECF No. 1 at ¶ 59.

which must be *followed by fire departments,* only if and when a fire department intends to use AFG funding:

> AFG funds used to acquire PPE may only be used to acquire compliant PPE for firefighting and nonaffiliated EMS personnel. Only the acquisition of PPE compliant with the most current edition of NFPA 1971, 1976, 1977, 1981, and 1999 are eligible activities. The acquisition of used, refurbished, or updated PPE will be ineligible for reimbursement.

DHS, Notice of Funding Opportunity, Fiscal Year of 2016 Assistance to Firefighters Grant Program at 35 (2016), https://www.fema.gov/sites/default/files/2020-07/FY16 _AFG_NOFO_ final_v3_09_01_2016.pdf ("NOFO 2016").  See also ECF No. 1 at ¶  27 (omitting the context provided in the broader paragraph when citing NOFO 2016 to claim that the AFG Program only permitted the acquisition of PPE complaint with the NFPA 1971).

These AFG requirements do not mandate that fire departments purchase turnouts from any specific manufacturer; they do not provide specifications that extend outside of those put forward by the NFPA, a non-governmental entity; and there has been no connection shown between turnouts acquired by Virginia Beach using AFG funding, Morning Pride's turnouts, and the turnouts actually worn by Plaintiffs.  At most, Defendant complied with NFPA standards to ensure the marketability and profitability of their products – not because they were "authorized to **act with or for** [FEMA and DHS] in **affirmatively executing duties** . . . under federal law." Id. (quoting City of Greenwood v. Peacock, 384 U.S. 808, 824 (1966)) (emphasis added).  See also Doe v. BJC Health Sys., 89 F.4th 1037, 1043 (8th Cir. 2023) (citing Buljic v. Tyson Foods, Inc., 22 F. 4th 730, 741 (8th Cir. 2021)) ("Cooperation with and encouragement from the federal government, alone, are insufficient to support federal officer removal."); Mohr v. Trustees of the University of Pennsylvania, 93 F.4th 100, 103 (3d Cir. 2024) ("Advancing governmental policy

while operating one's own business is not the same as executing a delegated governmental duty."); Graves v. 3M Co., 17 F.4th 764, 768 (8th Cir. 2021) ("The voluntary requirement for military review and input regarding proposed commercial instructions does not demonstrate that 3M was carrying out or assisting in the *government's* duties.  Government advice and assistance, like the regulatory rules at issue in Watson, do not establish the 'acting under' relationship that § 1442(a)(1) requires.") (emphasis in original).

Even if Defendant Morning Pride *was* subject to, and required to comply with, the AFG Program Standards – this still would not amount to "acting under" federal law.  "[T]he help or assistance necessary to bring a private person within the scope of [§ 1442(a)(1)] does *not* include simply *complying* with the law."  Watson v. Phillip Morris Cos., 551 U.S. 142, 152 (2007) (emphasis in original).  There is an important distinction between relationships where private entities are merely *subject to* federal regulation and relationships where the entity *contracts with* the federal government to fulfill a federal government need**.**  See Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 255 (4th Cir. 2017) (citing Watson v. Phillip Morris Cos., 551 U.S. 142, 153-54 (2007)).  The United States Supreme Court, in Watson, was clear: **The mere regulation of a private entity, and compliance thereto, does not justify removal under the statute**.  Sawyer, 860 F.3d at 255 (citing Watson, 551 U.S. at 154-54).  See also Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021) ("[B]usinesses that operate in fields subject to stringent federal regulations cannot use their compliance with federal law – without more – to invoke the federal officer statute."); Gov't of P.R. v. Express Scripts, Inc., 2024 U.S. App. LEXIS 26384, at *17 (1st Cir. Ct. App. Oct. 18, 2024) ("[A] private entity that merely complies with federal regulations does not act under a federal officer's authority because 'simple compliance with the law' does not assist the government in the same way."); BJC Health Sys., 89

F.4th at 1042 ("A business that simply follows federal law, even highly detailed and complex regulations, does not act under a federal officer.").  Here, Defendant Morning Pride was not required to follow any specific federal guidelines when manufacturing turnouts – but even if they were, it still would not amount to "acting under" federal authority.

### b. The City of Virginia Beach's Purchase of Turnout Gear From Defendant Morning Pride's Third-Party Distributor, Using Federal Grant Money, Does Not Amount to "Acting Under" A Federal Officer or Agency.

The mere provision of federal funding to the City of Virginia Beach's Fire Department is not sufficient to satisfy the "acting under" prong of § 1442(a)(1).  As recently as 2024, federal courts have stated that an entity is **not** "acting under a federal officer simply because it receives federal funding and is subject to 'a host of federal requirements and regulations pertaining to the [services] it provides."  Garcia v. N.Y.C. Health & Hosps. Corp., 2021 U.S. Dist. LEXIS 68575, at *4 (N.Y.S.D. Apr. 8, 2021) (quoting Veneruso v. Mt. Vernon Neighborhood Health Ctr., 586 Fed. Appx. 604, 607-08 (2d Cir. 2014)).  See e.g., Mays v. City of Flint, 871 F.3d 437, 444 (6th Cir. 2017) ("We acknowledge at the outset that the MDEQ does receive funds from the EPA.  But we conclude that the receipt of federal funding alone cannot establish a delegation of legal authority because finding such a delegation on that basis is way beyond the reasoning of Watson and would allow myriad state agencies to invoke federal-officer removal."); Doe v. Cedars-Sinai Health Sys., 106 F.4th 907, 917-18 (9th Cir. 2024) ("Nor do we agree that Cedars-Sinai's receipt of federal 'incentive payments' warrants the exercise of federal officer removal jurisdiction. The Watson Court indicated that evidence of 'payment' might show that a defendant acted under color of federal authority.  But it meant 'payment' of the type arising from a 'contract," "employer/employee relationship,' or any principal/agent arrangement.") (internal citations omitted); Mohr v. Trs. Univ. of Pa., 93 F.4th 100, 105 (rejecting the argument that federal incentive

payments indicate that the defendant acted as a government contractor); Doe v. Erlanger Health, No. 1:23-cv-297, 2024 U.S. Dist. LEXIS 110256, at *5 (Tenn. E.D.C. Apr. 8, 2024) ("Mere receipt of federal funding is not sufficient to establish the required level of control.").

In Valles v. Bayou Place, L.P., No. 4:19-CV-01725, 2019 U.S. Dist. LEXIS 225895, at *12-13 (Dec. 19, 2019), the Texas Southern District Court held, under Watson, that a remediation company providing disaster relief services to Houston, hired using FEMA-providing funding and subject to FEMA funding rules, was not "acting under" a federal officer when providing such services. The Court held:

> Despite [Defendant's] assertion that it was subject to FEMA inspection and oversight based on federal funding, it has provided no basis for me to find that FEMA ever did anything more to ensure simple compliance with applicable federal regulations. This is insufficient to show that [Defendant] was 'acting under' the subjection, guidance, or control of FEMA.

Valles, 2019 U.S. Dist. LEXIS 225895, at *13-14. Thus, as is agreed-upon by federal courts across the entire country, from Texas to California to New York, the receipt of federal funding from the AFG Program, then *potentially* used to acquire turnout gear from Defendant Morning Pride, does not and should not transform Defendant's actions in manufacturing and selling such gear into those taken "under" federal authority.

### c. The Manufacture of NFPA 1971 Compliant Turnout Gear Does Not Assist or Help Carry out the Express Duties of DHS and FEMA, so as to Amount to "Acting Under" a Federal Officer.

Defendant Morning Pride further claims they "acted under" DHS and FEMA "'to assist, or help carry out' express duties of its 'federal superior'" by manufacturing turnout gear, thus allegedly "fulfilling" DHS and FEMA's stated goals to "Strengthen National Preparedness and

Resilience."[14] This reasoning stretches the bounds of § 1442(a) far beyond what the case law permits.  See, e.g., Watson v. Phillip Morris Cos., 551 U.S. 142, 152  (2007) ("We recognize that sometimes an English speaker might say that one who complies with the law 'helps' or 'assists' governmental law enforcement.  Taxpayers who fill out complex federal forms, airline passengers who obey federal regulations prohibiting smoking . . . all 'help' or 'assist' federal law enforcement authorities in some sense of those words.  But that is not the sense of 'help' or 'assist' that can bring a private action within the scope of [§1442(a)(1)].").

When a contractual relationship does *not* exist, the Supreme Court still considers whether there had been a "delegation of legal authority" from the federal government to the private party, so as to satisfy the "acting under" standard.  Agyin v. Razmzan, 986 F.3d 168, 175 (2nd Cir. 2021) (quoting Watson, 551 U.S. at 156).  See also Doe v. Cedars-Sinai Health Sys., 106 F.4th 907, 914 (9th Cir. 2024) ("Something more must be present, like the 'delegation of legal authority,' which might include 'evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement.") (quoting Watson, 551 U.S. at 156); Cnty. of San Mateo v. Chevron Corp., 32 F.4th 733, 756-57 (9th Cir. Ct. App. 2022); Doe v. BJC Health Sys., 89 F.4th 1037, 1043 (8th Cir. 2023) ("[A] party acts under a federal officer, within the meaning of the federal officer removal statute, only when it performs a 'basic governmental task.' A basic governmental task involves a 'delegation of legal authority' from a federal entity. **In other words, the party acts on the government's behalf.**) (emphasis added) (internal citations omitted).  A private company may "act under" a federal officer if their relationship is "an unusually close one

---

[14] ECF No. 1 at ¶ 60 (quoting 2016 NOFO at 2). These are DHS and FEMA's goals for the 2016 version of the AFG Program – again, unrelated to any turnout manufacturers or distributors.

involving detailed regulation, monitoring, or supervision." Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharm., Inc., 996 F.3d 242, 251 (4th Cir. 2021) (quoting Watson, 551 U.S. at 153).

Here, because the extent of Defendant's involvement was the manufacture and sale of turnouts to a distributor, who then sold to the local Virginia Beach Fire Department, Defendant Morning Pride lacks contractual privity with DHS, FEMA, the AFG Program, the U.S. Military, the City of Virginia Beach, the City of Portsmouth, the Virginia Beach Fire Department, the Portsmouth Fire Department, or any other individual or entity relevant to this litigation. Looking beyond mere privity, Defendant Morning Pride lacks any "delegation of legal authority" from DHS or FEMA when it comes to the manufacture and sale of turnout gear to their distributors nor does Defendant possess an "unusually close" relationship with either federal agency. As discussed supra, Defendant Morning Pride had *no* relationship with DHS or FEMA outside of their *voluntary, unrequested* compliance with the AFG Program's funding-use rules, see 2016 NOFO at 35, which were directed to and for local fire departments – not directed to or for Defendant Morning Pride.

Failing to meet any of the above requirements for the "acting under" prong, Defendant's claim to fulfill DHS and FEMA's "stated goals" seemingly is based on the accepted idea that removal is still proper when a "*contractor* seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." Agyin, 986 F.3d at 175 (quoting Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 255 (4th Cir. 2017)). By providing the federal government with a product used to facilitate the government's business, a private entity "acts under" a federal officer because it "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." Id. (quoting Watson, 551 U.S. at 154). See e.g., Papp, 842 F.3d at 812 ("The classic case of such assistance as it relates to government contractors

is when the private contractor acted under a federal officer or agency because the contractors helped the Government to produce an item that it needed.") (internal quotation marks and alterations omitted); Ruppell v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012) ("'Acting under' covers situations ... where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."). But see Express Scripts, 996 F.3d at 251 ("[A] private company selling 'standardized consumer product[s]' to the federal government does not implicate the federal officer removal statute. Even when a contract specifies the details of the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute.") (internal citations omitted).

The examples of this principle vary, but none compare to the facts set forth before this Court in the present proceeding. For example, in Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 255 (4th Cir. 2017), the Fourth Circuit found that the defendant company had "acted under" a federal officer when the Plaintiff was exposed to asbestos during his work as a U.S. Navy shipbuilder after the Defendant company had manufactured asbestos-containing boilers *under a contract with the U.S. Navy* for use on Navy vessels. In Papp v. Fore-Kast Sales Co., 842 F.3d 805, 813 (2016), Boeing was found to have "acted under" the direction of a federal officer when, while working under a *federal contract*, it produced a military aircraft that caused Plaintiff's asbestos exposure. In other cases, the Courts have upheld federal officer removal "against a private insurance company which had *contracted with the federal government* to administer benefit provisions of Medicare" or, in another example, in a "garnishment action against a doctor who treated patients *under Medicare*." Agyin, 986 F.3d at 176 (quoting Gurda Farms, Inc. v. Monroe Cnty. Legal Asst. Corp., 358 F. Supp. 841, 844 (1973)) (emphasis added). In contrast, in Watson v. Phillip Morris Companies, Inc., 551 U.S. 142, 157 (2007), the defendant company **could not**

**remove** a deceptive and unfair business practices suit filed against it merely because it had **complied with Federal Trade Commission regulations** governing its advertising.

Here, Defendant Morning Pride was manufacturing turnouts – But not for the federal government; not pursuant to a federal contract; not to assist in federal firefighting services; not for specific use on federal property; and not in furtherance of the AFG Program. Defendant Morning Pride produced turnout gear for the City of Virginia Beach pursuant to the contract between Morning Pride and Morning Pride's distributor, therein based upon a contract for sale arranged between the distributor and the City itself. If these turnouts had not been purchased from Morning Pride's distributor, the provision of gear to the local municipal fire department would *not* have become the responsibility of the federal government, of DHS, or of FEMA – the City would have just contracted with different manufacturer to acquire the turnouts elsewhere. Similarly, Defendant's manufacture and sale of turnouts had no bearing on the workings or impact of the AFG Program.

Moreover, Defendant's manufacture of these turnouts was not done under the authority of, or directly in relation to, DHS, FEMA, and Congress's goals to "Strengthen National Preparedness and Resilience," see 2016 NOFO at 2, or "reduce the Nation's losses caused by fire." See 15 U.S.C. § 2202(1) (stating the purpose behind the *entirety* of Chapter 49 - Fire Prevention and Control, which includes the creation of the United States Fire Administration). The quoted "goal" to strengthen national preparedness is the "basic mission" of the AFG Program – a program dedicated to providing funding to local fire departments and which has no concern with Defendant Morning Pride specifically or turnout manufactures generally. As asserted supra, Defendant lacked any "delegation of legal authority" from, nor *any* relationship, let alone an "unusually close" one, with DHS and FEMA.

Ultimately, Defendant's actions are more akin to the examples set forth <u>supra</u> in <u>Watson</u>, which, while maybe Defendant is "helping" the government's goals of generally reducing fire damage by providing gear to local firefighters, "not [in] the sense of 'help' or 'assist' that can bring a private action within the scope of [§1442(a)]." <u>Watson</u>, 551 U.S. at 152. <u>See also</u> <u>Buljic</u>, 22 F.4th 730, 741 ("[T]he fact that an industry is considered critical does not mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers."). Since Defendant lacks the requisite relationship, contractual or otherwise, with DHS and FEMA, nor were they engaged in the production of a product *for* the federal government, they again fail to meet the "acting under" prong.

### d.   *The Mere Fact That Defendant Morning Pride May Have Provided Gear Used In Connection with the City of Virginia Beach's Independent Contracts with Federal Entities Does Not Satisfy the "Acting Under" Prong.*

Defendant Morning Pride also points to the City of Virginia Beach's various aid agreements with nearby military bases to claim that the Defendant themselves has "directly assist[ed]" the federal government.[15] This again misconstrues the standard for § 1442(a)(1) removal: *The City of Virginia Beach contracted with various U.S. military bases – Defendant Morning Pride did not*. The various agreements cited in Defendant's Notice of Removal[16] agree that the City of Virginia Beach and the Fire Department will provide "apparatus," "personnel," or "equipment," as needed, to respond to fires. These agreements do not stipulate what kind of equipment or apparatuses; they do not require a specific type or brand of turnout; they do not require any equipment or apparatuses to follow any specific set of guidelines; and they have no direct relation to Defendant Morning Pride or Defendant Morning Pride's products. Again, as

---

[15] ECF No. 1 at ¶ 60.

[16] ECF No. 1 at ¶ 34. <u>See also</u> ECF Nos. 1-2, 1-3, 1-4, and 1-5.

discussed <u>supra</u>, Defendant Morning Pride did not step in to "perform[] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." <u>Agyin v. Razmzan</u>, 986 F.3d 168, 175 (2nd Cir. 2021) (quoting <u>Watson</u>, 551 U.S. at 154). Defendant merely provided a product to a distributor, which in turn provided said product to the City of Virginia Beach, all of which Virginia Beach could have, and did, acquire from multiple other manufacturers and distributors for a variety of uses.

It is also important to note that Defendant Morning Pride has not claimed that they knew about these various military agreements at the time of manufacturing the turnout(s) at issue; they have never claimed that the existence of such agreements impacted their decision to sell to their distributor in Virginia Beach or that it had any effect on the turnouts that they provided; they have never claimed that their turnouts were ever *actually* used at a military base; they have never claimed that any of the Plaintiffs or Decedents used Morning Pride turnouts while providing services to a military base; and, in fact, they have **never** alleged any tangible connection between themselves, Plaintiffs, the claims in Plaintiffs' Complaint, and the U.S. Military. In reality, Defendant Morning Pride has found a random connection to the federal government, wholly unrelated to them, and is now attempting to extrapolate it to forum shop. § 1442(a)(1) was not intended to serve **private** interests in that way. <u>See</u> <u>Doe v. Cedars-Sinai Health Sys.</u>, 106 F. 4th 907, 914 (9th Cir. Ct. App. 2024) (quoting <u>Watson</u>, 551 U.S. 142, 150) ("'[T]he removal statutes basic purpose is to protect the Federal Government from the interference with its "operations" that would ensue were a State able, for example, to "arres[t]" and bring 'to trial in State cour[t]' officers or agents of the federal government 'acting within the scope of their authority.'").

Defendant Morning Pride has also attempted to claim that the City of Virginia Beach was a federal "contractor," simply because they claim that the AFG Funding Program "considers grant

recipients" to be "contractors," thus, in their view, making Morning Pride a federal subcontractor subject to federal officer removal.[17]    Defendant Morning Pride has come to this far-fetched conclusion by picking through random AFG Program Funding Notices to cherry-pick language: According to Defendant, "DHS refers to the recipients of the end-funding of the AFG as 'contractor[s]' and requires that they are not 'suspended or debarred from participating in specified federal procurement or non-procurement transactions.'"[18]  The provision, cited to support Defendant's claim that the City of Virginia Beach is a "contractor," comes from the 2016 Notice of Funding Opportunity ("2016 NOFO"), and is contained in *the middle of a paragraph in Appendix C, forty-eight pages into the document, related to fees for grant writers.*  The full paragraph states:

> Fees for grant writers may be included as a pre-award expenditure. Fees payable on a contingency basis are not an eligible expense. For grant writer fees to be eligible as a pre-award expenditure, the fees must be specifically identified and listed in the Request Details section of the application. FEMA will only consider reimbursements for application preparation, not administration, up to but not more than $1,500. Pursuant to 2 C.F.R. Part 180, recipients may not use federal grant funds to reimburse any entity, including a grant writer or preparer, if that entity is presently suspended or debarred by the Federal Government from receiving funding under federally-funded grants or contracts. **Recipients must verify that the contractor is not suspended or debarred from participating in specified federal procurement or non-procurement transactions** pursuant to 2 C.F.R. § 180.300.

2016 NOFO at 48 (emphasis added).  The word "contractor" is used a total of *six* times in the entire *fifty-six-page* document, *exclusively within the appendices*.  When read in context, "contractors" does not refer to the recipients of the funding, that is, the City of Virginia Beach, but is off-handedly used as a pronoun to refer to the contracted-with entities with whom the recipient's

---

[17] ECF No. 1 at ¶ 61.

[18] ECF No. 1 at ¶ 29.

receive products and services.  2016 NOFO at 51.  This remains true in the 2019, 2021, 2022, and 2023 NOFO's.[19]  2019 NOFO at 59, 63-64 ("contractor" used seven times, occurring only in Appendix C, exclusively referring to conflicts of interest); 2021 NOFO at 6, 17, 27, 35, 40, 46-49, 74 ("contractor" used fourteen times in the 78-page document, exclusively used to refer to "[c]onsultants or contractors of the recipient."); 2022 NOFO at 7, 16, 30, 39-42, 80 ("contractor" used twelve times in the 84-page document, exclusively used to refer to "[c]onsultants or contractors of the recipient."); 2023 NOFO at 9, 19, 32, 40-42, 83 ("contractor" used thirteen times in the 88-page document, exclusively used to refer to "[c]onsultants or contractors of the recipient.").  At most, then, the term "contractor" could be construed to refer to the *distributor company* from whom the City of Virginia Beach actually purchased the Morning Pride turnouts from.  Moreover, this spare, offhanded use of "[c]onsultants or contractors," <u>see</u> 2021 NOFO at 6; 2022 NOFO at 7; 2023 NOFO at 9, could, at most, imply the distributor company is a *state*[20] contractor, not a federal one.  <u>See</u> 2016 NOFO at 52 (referring to concerns for the "contractors" with recipient "non-federal entit[ies]").[21]  Regardless of the interpretation of the use of the word

---

[19] <u>See</u> ECF No. 1 at ¶ 30. DHS, Notice of Funding Opportunity, Fiscal Year 2019 Assistance to Firefighters Grant Program (2019), https://www.fema.gov/sites/default/files/2020-07/FY19AFGNOFINAL.pdf ("2019 NOFO"); DHS, Notice of Funding Opportunity, Fiscal Year 2021 Assistance to Firefighters Grant Program (2021), https://www.fema.gov/ sites/default/files/documents/fema_fy21-afg-fps-nofo.pdf ("2021 NOFO"); DHS, Notice of Funding Opportunity, Fiscal Year 2022 Assistance to Firefighters Grant Program (2022), https://www.fema.gov/sites/default/files/documents/fema_fy-22-afg-nofo.pdf ("2022 NOFO"); DHS, Notice of Funding Opportunity, Fiscal Year 2023 Assistance to Firefighters Grant Program (2023), https://www.fema.gov/sites/default/files/documents/fema_gpd-fy-2023-afg-notice-of-funding-opportunity.pdf ("2023 NOFO").

[20] As discussed <u>infra</u>, Defendant Morning Pride's distributor entered into a contract exclusively with a state entity, and was clearly not a federal contractor nor does the NOFO language intend to imply as such.

[21] It is worth noting that AFG funding program defines the eligible fire departments as those in a arrangement with a **state or local authority**.  DHS, Notice of Funding Opportunity, Fiscal Year 2019 Assistance to Firefighters Grant Program at 3 (2019), https://www.fema.gov/sites/default/files/2020-07/FY19AFGNOFINAL.pdf ("2019 NOFO").  In fact, it even goes on to specify that "[f]ire departments that are a Federal Government entity, or contracted by the Federal Government, and are solely responsible

"contractor," this derives from a Notice of Funding – not a court opinion, a statute, a contract, nor any binding document which has any relevancy to the actual standards set forth for obtaining federal officer jurisdiction.

Moreover, the mere fact that the City of Virginia Beach "does business with"[22] the federal government does not transform any other entity with whom they conduct business into a federal contractor or subcontractor. See Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 251 (4th Cir. 2021) ("[A] private company selling 'standardized consumer product[s] to the federal government does not implicate the federal officer removal statute.") (citing Baltimore v. BP P.L.C., 952 F.3d 452, 463 (4th Cir. Ct. App. 2020) (overturned on other grounds related to § 1447)). Such a wide reading would grossly misconstrue the purposes of § 1442(a)(1).

Ultimately, Defendant Morning Pride has not established that the manufacture or provision of turnouts, "the act that is the subject of Plaintiffs' attack," see Issacson v. Dow Chem Co., 517 F.3d 129, 138 (2008), occurred *while* the Defendant was performing **official duties** on behalf of the **federal** government. Defendant Morning Pride has **no** connection to the federal government, insofar as Plaintiffs' case is concerned. They **never** entered into any contract or agreement with any federal body or agency. They were **not** providing goods to the federal government or federal employees. They were **not** providing services on behalf of the federal government. They were **not** subject to federal contractual guidelines. **In fact, outside of general compliance with voluntary federal funding guidelines, they were never subject to the federal government's**

---

under a formally recognized agreement for suppression of fires on federal installations or land" are ineligible for funding. 2019 NOFO at 26.

[22] See ECF No. 1 at ¶ 28.

**control.**  As such, Defendant Morning Pride has failed to satisfy the first prong, thus failing to establish § 1442(a)(1) jurisdiction.

**B.  Defendant Morning Pride was Not a "Contractor" for the Purposes of Asserting the Federal Contractor Defense.**

Plaintiffs concede that the federal contractor defense is a colorable federal defense for the purpose of establishing § 1442(a)(1) jurisdiction.  See, e.g., Cnty Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 254-55 (4th Cir. 2021) (discussing the invocation of government contractor immunity in the context of 1442(a) removal).  However, Plaintiffs do not agree that such a defense applies to Defendant Morning Pride, since Defendant Morning Pride was not a federal contractor and there has been no evidence of a "conflict with state law."  See Id. at 255.

At its core, before an analysis of the elements required to satisfy this defense can begin, the federal contractor defense requires the invoking party to be a federal contractor.  See Express Scripts Pharmacy, Inc., 996 F.3d at 255 ("This defense applies when: (1) the government 'approved reasonably precise specifications'; (2) the *contractor's* performance 'conformed to those specifications'; and (3) the *contractor* alerted the government to dangers 'known to [the contractor] but not to the United States.'") (quoting Ripley v. Foster Wheeler LLC, 841 F.3d 207, 210 (2016)) (emphasis added).  Defendant cannot be a federal contractor, at least in the context of Plaintiffs' Complaint: they did not enter into a contract with any branch, agency, or member of the federal government – *the City of Virginia Beach did*.  Even then, this would not amount to "subcontractor" status, since Defendant Morning Pride did not contract with the City directly. Instead, Defendant Morning Pride entered into a contract with a *distributor*, who then entered into

a contract with the City.  This attenuated connection fails to transform Defendant into a federal contractor.

Moreover, the federal contractor defense **only** applies "if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both." Express Scripts, 996 F.3d at 255 (quoting Ripley, 841 F.3d at 210)).  This requires that both that "the procurement of equipment by the United States [be] an area of uniquely federal interest" and that "'significant conflict' exist[] between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." Boyle v. United Techs. Corp., 487 U.S. 500, 507-08 (1988) (internal and external citations omitted).  Even if Defendant Morning Pride was considered a federal contractor (or subcontractor) by way of its "obligations" to provide turnout gear to its distributor, to then be sold to the City of Virginia Beach, and assuming that such turnout gear was purchased using AFG Program funding, *no conflict with state law has been demonstrated*.

First, Defendant's "obligation" to provide turnout gear to their private distributor, pursuant to a distribution agreement, is not "an area of uniquely federal interest," as it implicates only state-law based contractual interests; there is no "obligation" to manufacture turnout gear pursuant to AFG Program guidelines, since such guidelines are directed at how funding may be used by recipients, not manufacturers; and even if Defendant had an "obligation" to manufacture turnout gear pursuant to AFG Program guidelines, this would not be a "uniquely federal interest," as these guidelines are voluntarily adopted and procured from a non-governmental organization (the NFPA).  Second, there is no evidence that *any* conflict exists between the specifications set forth

by DHS and FEMA in the AFG Program requirements and the operation of state law.[23]  Virginia has not regulated the specific manufacture of turnouts nor has Virginia sought to control the use of PFAS chemicals in the materials used to create turnouts.

Thus, Defendant Morning Pride is neither a federal contractor, since their business is inherently state based, nor is there a sufficient conflict so as to invoke the federal contractor defense.

## C.   Defendant Morning Pride's Act of Providing Turnouts to a Distributor Who, In Turn, Provided Turnouts to Virginia Beach and/or Portsmouth was not "For" Nor Did it "Relate To" Federal Authority

Defendant Morning Pride's argument for asserting that it satisfied the third prong of 28 U.S.C. § 1442(a)(1), being that their act in question was "for or related to" an act under color of federal office, merely reiterates the three points addressed above: (1) that the turnout gear was (potentially) purchased used AFG Program funds; (2) that the turnout gear was manufactured in compliance with NFPA 1971 standards, which were also adopted by the AFG Program; and (3) that these local firefighters may have provided firefighting services to nearby military bases under independent contracts, so Defendant's products *could* have been used during firefighting services for the federal government.[24]  Their argument stretches § 1442(a)(1) to its breaking point.

For Defendant Morning Pride to meet its burden and satisfy the third prong, Defendant must demonstrate that the conduct complained-of was "connected," "associated," or "relat[ed] to" official federal authority.  See Papp v. Fore-Kast Sales Co., 842 F.3d 805, 813 (3rd Cir. 2016);

---

[23] Virginia's law merely requires that "[t]he governing body of every county, city, and town shall have power to provide for the purchase . . . of suitable equipment for firefighting."  Va. Code § 27-15.2.  No further proscriptions exist in Virginia statute which govern the manufacture of turnouts.

[24] See ECF No. 1 at ¶¶ 82-83.

Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 254-55 (4th Cir. 2021).[25] Put differently, Defendant Morning Pride must show that the acts they are being sued for occurred because of what they were asked to do by the federal government. Issacson v. Dow Chem. Co., 517 F.3d 129, 137-38 (2d Cir. 2008). *Defendant Morning Pride did not, nor have they ever claimed to, manufacture the turnouts at issue "under federal authority" nor did the federal government ever ask them to manufacture these turnouts.*

As discussed in detail supra, no federal authority to manufacture and distribute turnouts ever existed in the first place – Defendant did not contract with the anyone besides their own distributor when it came to the manufacture and distribution of the specific turnouts complained-of, thus creating no federal contractual authority; no duties or obligations were given to Defendant outside of their voluntary compliance with federal grant standards; and Defendant had zero relation to, or mention in, any contracts between the City and the various military bases. Defendant Morning Pride cannot claim that they manufactured and provided turnouts to Virginia Beach because the federal government asked them to. Simply put, they fail to show how their actions meet the applicable standard.

It is only by virtue of the relationship between the distributor and the local government, followed by the local government's relationship to the local military bases, that Defendant is able to claim some derivative "connection" or "association" to the federal government. See Estate of Troilo v. Place, 2023 U.S. Dist. LEXIS 21902, at *18-19 (Penn. Dist. Ct. Feb. 9, 2023) (noting that the Defendants failed to satisfy § 1442(a)(1) jurisdiction because they "do not allege that they themselves communicated or worked directly with federal agencies."). It is not enough to claim

---

[25] It is notable that Papp and Express Scripts both postdate the 2011 amendment to § 1442(a)(1), cited by Defendant, which added "relating to" into the statute's language. See ECF No. 1 at ¶ 80.

that, generally, they did something that tangentially affected the federal government.  See, e.g., Watson v. Phillip Morris Cos., 551 U.S. 142, 152 (2007 Doe v. Cedars-Sinai Health Sys., 106 F.4th 907, 914 (9th Cir. 2024); Cnty. of San Mateo v. Chevron Corp., 32 F.4th 733, 756-57 (9th Cir. Ct. App. 2022); Doe v. BJC Health Sys., 89 F.4th 1037, 1043 (8th Cir. 2023).

Unlike the case law favoring federal officer removal, which involve boilers manufactured for Navy ships, see Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 258 (4th Cir. 2017); airplanes manufactured for the Armed Forces, see Papp, 842 F.3d at 814; or turbines and generators manufactured pursuant to contracts with the Navy, see Hurley v. CBS Corp., 648 Fed. Appx. 299, 303 (4th Cir. Ct. App. 2016), *Plaintiffs' injuries are associated with their roles as a **local firefighters**.*  The act of providing turnouts to Plaintiffs simply lack any nexus to the federal government or federal government agencies.  Thus, Defendant Morning Pride has also failed to satisfy the third prong of 1442(a)(1) jurisdiction.

To accept Defendant Morning Pride's line of reasoning, as set forth in their Notice of Removal, would be to open up the federal courts to a plethora of cases unrelated to "cognizable federal interest[s]." See Gov't of P.R. v. Express Scripts, Inc., 2024 U.S. App. LEXIS 26384, at *15 (1st Cir. Ct. App. October 18, 2024) (quoting Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 487 (1st Cir. Ct. App. 1989).  Under Defendant's line of reasoning, any company who can allege any connection to the federal government will be able to claim federal officer jurisdiction.  This reasoning extends far beyond Congress's intent when enacting § 1442(a)(1).  See W. Va. ex rel. McCuskey v. Eli Lilly & Co., No. 5:24-CV-143, 2024 U.S. Dist. LEXIS 160669 (W. Va. Dist. Ct. Sep. 6, 2024) (quoting Watson, 551 U.S. at 142-43) ("[T]he statute was meant to protect 'private persons "who lawfully assist" a federal officer "in the

performance of his official duty," but "only" if the private parties were "authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law.""").

Having failed to satisfy any of the three requirements for federal officer jurisdiction under § 1442(a)(1), and with no other valid grounds for federal subject matter jurisdiction, this matter must be remanded to state court.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Honorable Court grant this Motion to Remand and remand this action back to the Circuit Court for the City of Virginia Beach, as well as order the payment of any just costs and expenses incurred by Plaintiffs.

**Respectfully yours,**
**SARA P. CHIAVEROTTI,**
**Executrix of the Estate of**
**MATTHEW R. CHIAVEROTTI,**
**deceased,**
**GARLAND L. ALEXANDER,**
**MICHELLE M. GALLINA,**
**Executrix of the Estate of**
**MATTHEW A. GALLINA, deceased,**
**DANIEL M. KELLOGG,**
**JOHN F. PACE,**
**JOSHUA S. XENAKIS,**
**JOSEPH H. ALBERT,**

**Plaintiffs**

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451

Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*
*Counsel for Plaintiff*

# C E R T I F I C A T E

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: <u>May 16, 2025</u>

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*