UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SARA P. CHIAVEROTTI, *Executrix of the Estate of Matthew R. Chiaverotti, deceased, et al.*,

Plaintiffs,

v.

3M COMPANY, *et al.*,

Defendants.

Civil No. 2:25cv232

**ORDER**

Pending before the Court are a Motion to Remand (the "Motion") (ECF No. 22) and a Memorandum in Support thereof (ECF No. 23) filed by Plaintiffs Sara P. Chiaverotti, *Executrix of the Estate of Matthew R. Chiaverotti, deceased*, Garland L. Alexander, Michelle M. Gallina, *Executrix of the Estate of Matthew A. Gallina, deceased*, Daniel M. Kellogg, John F. Pace, Joshua S. Xenakis, and Joseph H. Albert (collectively, "Plaintiffs"). The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs.[1] *See* E.D. Va. Local Civ. R. 7(J). For the following reasons, the Motion (ECF No. 22) is **GRANTED**.[2]

---

[1] Accordingly, Plaintiffs' Request for a Hearing (ECF No. 30) is **DENIED**.

[2] Also pending before the Court is a Motion to Stay Pending the Judicial Panel on Multidistrict Litigation ("JPML") Decision on Transfer (the "Motion to Stay") (ECF No. 40) and a Memorandum in Support thereof (ECF No. 41) filed by Defendants Archroma U.S., Inc., Blue Ridge Rescue Suppliers, Inc., Bradsen Solutions, Inc.,

1

## I.     BACKGROUND

### A.     Facts

Plaintiffs are current and retired firefighters (the "Firefighter Plaintiffs") who have served the cities of Portsmouth and Virginia Beach, Virginia, and two spouses of deceased firefighters (the "Decedents") who served the city of Virginia Beach, Virginia. Am. Compl. ¶ 8, PageID#86–142, ECF No. 1-1 ("Am. Compl."). In the course of their duties, the Firefighter Plaintiffs and Decedents regularly wore "turnouts," protective clothing specifically designed for firefighters. *Id.* ¶¶ 9, 17. Defendants,[3] including Honeywell International Inc. and Honeywell Safety Products USA, Inc. (together, "Morning Pride"), manufactured, designed, sold, supplied, and distributed these turnouts to fire departments and training facilities. *Id.* ¶ 14. Unbeknownst to the Firefighter Plaintiffs and Decedents, these turnouts purportedly contained

---

Honeywell International Inc., Honeywell Safety Products USA, Inc., EIDP Inc., The Chemours Company, and W.L. Gore & Associates, Inc. (collectively, the "Moving Defendants"). On August 29, 2025, Defendant 3M Company filed a motion to transfer this case to *In re Aqueous Film-Forming Foams ("AFFF") Products Liability Litigation*, MDL No. 2873 (D.S.C.). Mem. Supp. ¶ 12, ECF No. 41; Mot. Ex. A, ECF No. 40-1. In the Motion to Stay, the Moving Defendants requested a stay of all proceedings in this case until 28 days after the JPML made a final determination on the issue of transfer. Mot., ECF No. 40. On December 11, 2025, the JPML issued an Order denying transfer of the above-captioned case to the AFFF multidistrict litigation. Notice, ECF No. 48. As such, the Motion to Stay (ECF No. 40) is **DENIED as moot**.

[3] The current defendants in this action are 3M Company, AGC Chemicals Americas, Inc., Archroma U.S., Inc., Arkema, Inc., Blue Ridge Rescue Suppliers, Inc., Bradsen Solutions, Inc., Daikin America, Inc., E.I. Du Pont De Nemours And Company, Globe Manufacturing Company, LLC, Honeywell International Inc., Honeywell Safety Products USA, Inc., Lion Group, Inc., MSA Safety Sales, LLC, Municipal Emergency Services, Inc., PBI Performance Products, Inc., Stedfast USA, Inc., Tencate Protective Fabrics USA d/b/a Southern Mills Inc., The Chemours Company L.L.C., and W.L. Gore & Associates, Inc. (collectively, "Defendants").

PFAS,[4] or "forever chemicals," which are used in products designed to resist oil, stains, heat and water, and are immune to degradation. *Id.* ¶¶ 10–11. Human exposure to PFAS—through inhalation, ingestion, or dermal contact—has been found to concentrate in the blood, bones, and organs and has been associated with multiple and serious adverse health effects, including cancer. *Id.* ¶¶ 11–12. Due to wearing turnouts in the regular course of their firefighting duties, the Firefighter Plaintiffs and Decedents were repeatedly exposed to PFAS, and they were not warned about the substantial health consequences that can result from such exposure. *Id.* ¶¶ 14–15. This repeated exposure to PFAS-containing turnouts resulted in the Firefighter Plaintiffs and Decedents developing various forms of cancer.[5] *Id.* ¶ 17.

## B.    Procedural History

On April 12, 2024, Plaintiffs filed a civil complaint in the Circuit Court for the City of Virginia Beach asserting several causes of action against Defendants under Virginia state law. *See generally* Compl., PageID#27–84, ECF No. 1-1. On March 24, 2025, Plaintiffs obtained leave to file an amended complaint. Am. Compl. Therein, Plaintiffs assert claims for breach of implied warranties (Count I), *id.* ¶¶ 122–43,

---

[4] Per- and polyfluoroalkyl substances ("PFAS") are human-made chemicals consisting of a chain of carbon and fluorine atoms. Am. Compl. ¶¶ 9–10.

[5] Specifically: (1) Plaintiff Garland L. Alexander was diagnosed with prostate cancer in December 2017, Am. Compl. ¶¶ 20–21; (2) Plaintiff Daniel M. Kellog was diagnosed with prostate cancer in October 2020, *id.* ¶¶ 23–24; (3) Plaintiff John F. Pace was diagnosed with prostate cancer in April 2022, *id.* ¶ 25; (4) Plaintiff Joshua S. Xenakis was diagnosed with papillary thyroid cancer in July 2023, *id.* ¶ 26; and (5) Plaintiff Joseph H. Albert was diagnosed with Hodgkin Lymphoma in August 2023, *id.* ¶ 27. Decedent Matthew R. Chiaverotti was diagnosed with and later died from anaplastic thyroid cancer in April 2023. *Id.* ¶ 19. Decedent Matthew Gallina was diagnosed with and later died from advanced esophageal cancer in August 2024. *Id.* ¶ 22.

breach of express warranties (Count II), *id.* ¶¶ 144–66, negligence, gross negligence, recklessness and willful and wanton misconduct (Count III), *id.* ¶¶ 167–85, and violations of the Virginia Consumer Protection Act, Va. Code § 59.1-196 *et seq.* (Count IV), *id.* ¶¶ 186–98. Plaintiffs seek compensatory, punitive, and treble damages, as well as attorneys' fees and costs. *Id.* ¶¶ 199–204.

On April 16, 2025, Morning Pride removed this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Notice of Removal, ECF No. 1. In its notice of removal, Morning Pride asserts that removal is proper because it acted under a federal officer when it sold turnout gear to the City of Virginia Beach and the Virginia Beach Fire Department in compliance with federal specifications and because such gear was used to provide firefighting services to the United States Military. *Id.* ¶ 49. It additionally argues that it has a federal contractor defense, and that there is a nexus between its use of PFAS in its turnout gear and federal authority requiring PFAS in turnout gear. *Id.* ¶¶ 50–51.

On May 16, 2025, Plaintiffs moved for this action to be remanded to the Circuit Court for the City of Virginia Beach, arguing that this action was improperly removed to federal court in the absence of subject matter jurisdiction. Mot., ECF No. 22; Mem. Supp., ECF No. 23. On June 11, 2025, Morning Pride responded in opposition, ECF No. 29, and on June 17, 2025, Plaintiffs replied, ECF No. 33.[6] The Motion is ripe for adjudication.

---

[6] On March 19, 2026, Plaintiffs filed a Notice of a Ruling in a Related Matter, ECF No. 53, to inform the Court of a recently issued Opinion & Order in *Moretz v. 3M Company*, No. 2:25cv616 (E.D. Va. Mar. 16, 2026), ECF No. 18. The Court has

## II.   LEGAL STANDARD

When a party seeks to remove a matter from state court to federal court, it bears the burden of demonstrating that removal is proper and that the federal court has jurisdiction. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction," the case must be remanded to state court. 28 U.S.C. § 1447(c).

28 U.S.C. § 1442(a)(1) permits a case that does not otherwise present a federal question to be removed to federal court if the state law claims arise under the actions of a federal officer. 28 U.S.C. § 1442(a)(1). This section, "commonly referred to as the 'federal officer removal statute,' authorizes the removal to federal court of any 'civil action or criminal prosecution' commenced in a state court against 'any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting 28 U.S.C. § 1442(a)(1)). To qualify for removal under this statute, "a private defendant must show: (1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *Mayor & City Council of Baltimore v. BP PLC*, 31 F.4th 178, 228 (4th Cir. 2022) (citation modified); *see also Anne Arundel Cnty. v. BP PLC*, 94

---

reviewed that decision and considers it herein only to the extent it is relevant to the issues in this proceeding.

F.4th 343, 347–48 (4th Cir. 2024).

After an action is removed to federal court, the plaintiff may move to remand if jurisdiction is defective. 28 U.S.C. § 1447(c). In resolving such motions, courts must construe the federal officer removal statute broadly in favor of a federal forum. *See Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (citing *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)); *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 250–51 (4th Cir. 2021). The federal officer removal statute "is an exception to the well-pleaded complaint rule insofar as it allows suits against federal officers to be removed despite the nonfederal cast of the complaint." *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (citation modified). Accordingly, "when a plaintiff sues a defendant that can plausibly invoke removal under § 1442(a)(1), he relinquishes his otherwise ubiquitous power to select a state forum instead of a federal one by writing his complaint a certain way." *Id.*; *see Willingham*, 395 U.S. at 407 (holding that "Congress has decided that federal officers . . . require the protection of a federal forum," and "[t]his policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).").

## III.   ANALYSIS

Plaintiffs assert that remand is appropriate because Morning Pride fails to satisfy any of the three elements of federal officer jurisdiction. Mem. Supp. at 8, ECF No. 23. Specifically, Plaintiffs argue that Morning Pride was not acting under a federal officer when it provided turnouts to a distributor, who, in turn, provided those turnouts to the City of Virginia Beach and the Virginia Beach Fire Department. *Id.*

at 9–24. Plaintiffs additionally aver that Morning Pride was not a "contractor" for the purposes of asserting the federal contractor defense and that Morning Pride's providing of turnouts to a distributor was not for, or in relation to, any federal authority. *Id.* at 24–29.

The Court begins by analyzing the first prong of the federal officer removal statute, as resolution of the Motion turns on whether Morning Pride was acting under a federal officer when it produced turnout gear that was ultimately provided to the City of Virginia Beach and the Virginia Beach Fire Department. Because the Court finds that Morning Pride cannot establish the first prong of federal officer jurisdiction, it concludes that removal is improper under 28 U.S.C. § 1442(a)(1).

## A.    The "Acting Under" a Federal Officer Requirement

A private party may invoke § 1442(a) removal jurisdiction if it was "authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151 (2007) (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)). For a private party to be "acting under" a federal officer, the actions at issue must "involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (citing *Davis v. South Carolina*, 107 U.S. 597, 600 (1882)). Although the phrase "acting under" is "broad" and to be "liberally construed" in favor of removal, it "is not limitless." *Id.* at 147; *Sawyer*, 860 F.3d at 255.

The paradigmatic example of "acting under" involves government contractors. The Supreme Court has explained that contractors fall within the statute where their

7

relationship with the government is "unusually close," involving "detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 149. This is because such contractors do more than comply with federal law—they assist federal officers in carrying out basic governmental functions that the government itself would otherwise have to perform. *Id.* at 153–54. Consistent with this principle, courts routinely find the "acting under" requirement satisfied where contractors are sued for conduct arising from manufacturing equipment or products for the government. *See, e.g., Sawyer*, 860 F.3d at 255 (collecting cases and finding that "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government.*"); *Hurley v. CBS Corp.*, 648 F. App'x 299, 303 (4th Cir. 2016) ("GE is a 'person acting under' a federal officer because it was acting under a valid government contract at all times relevant to the litigation"); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) ("Papp's allegations are directed at actions Boeing took while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government otherwise would have been forced to produce on its own."). By contrast, merely selling standardized goods or services to the government—even under detailed contractual terms and supervision—does not suffice. *Express Scripts*, 996 F.3d at 251 ("[A] private company selling 'standardized consumer product[s]' to the federal government does not implicate the federal officer removal statute. Even when a contract specifies the details of the sale and authorizes the government to

8

supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute." (internal citation omitted)).

A direct contractual relationship, however, is not required. *See id.* at 254. Instead, "courts must look beyond whether the [defendants] are parties to a contract with [the federal government] to the nature of the relationship between them." *Id.* The Supreme Court has emphasized that a qualifying relationship "typically involves subjection, guidance, or control" on the part of the federal government. *Watson*, 551 U.S. at 151 (internal quotation marks omitted). Courts also consider whether there has been a "delegation of legal authority" from the federal government to the private party. *Id.* at 155; *cf. Mayor & City Council of Baltimore v. BP PLC*, 952 F.3d 452 (4th Cir. 2020), *vacated and remanded on other grounds*, 593 U.S. 230 (2021) ("[C]losely supervised government contractors are distinguishable from intensely regulated private firms because the former assist the government in carrying out basic governmental functions.").

By contrast, "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152. As the Supreme Court explained in *Watson*, "sometimes an English speaker might say that one who complies with the law 'helps' or 'assists' governmental law enforcement," but this behavior constitutes "*compliance* with the law (or *acquiescence* to an order), not . . . 'acting under' a federal officer who is giving an order or enforcing the law." *Id.*; *see also, e.g., Express Scripts*, 996 F.3d at 251 ("[B]usinesses that operate in fields subject to stringent federal regulations cannot use their

compliance with federal law—without more—to invoke the federal officer removal statute."); *Doe v. BJC Health Sys.*, 89 F.4th 1037, 1043 (8th Cir. 2023) ("Cooperation with and encouragement from the federal government, alone, are insufficient to support federal officer removal."); *Mohr v. Trs. Of Univ. of Pennsylvania*, 93 F.4th 100, 105 (3d Cir. 2024) ("Advancing governmental policy while operating one's own business is not the same as executing a delegated governmental duty.").

Nor is it enough that a private entity receives federal funding, even where that funding carries regulatory conditions. *See, e.g., Mays v. City of Flint, Mich.*, 871 F.3d 437, 444–45 (6th Cir. 2017) ("[T]he receipt of federal funding alone cannot establish a delegation of legal authority because finding such a delegation on that basis is way beyond the reasoning of *Watson* and would allow myriad [private parties] to invoke federal-officer removal."); *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 917–18 (9th Cir. 2024) (collecting cases and stating "[n]or do we agree that [the private party]'s receipt of federal 'incentive payments' warrants the exercise of federal officer removal jurisdiction.").

### B. Morning Pride's Production of Turnout Gear for the Virginia Beach Fire Department[7]

Morning Pride is a "cut-and-sew" manufacturer, meaning that it builds its turnout gear from technical protective fabrics sourced from manufacturers that supply all turnout gear providers. Notice of Removal ¶ 15, ECF No. 1. Some of these fabrics contain certain PFAS "to achieve performance characteristics such as

---

[7] The Court finds it necessary to set forth an abbreviated version of Morning Pride's purported grounds for "acting under" a federal officer before explaining why such grounds are not sufficient.

resistance to water, oil, and chemicals." *Id.* Its turnout gear is customized and built to order for the firefighter who will wear it. *Id.* ¶ 16. Morning Pride primarily sells its gear through distributors, which in turn contract with fire departments such as the Virginia Beach Fire Department and the Portsmouth Fire Department. *Id.* ¶¶ 16–17.

The National Fire Protection Association ("NFPA") is a nonprofit organization that promulgates fire safety standards. *Id.* ¶ 18. Prior to 2024, the NFPA 1971 Standard established performance standards for structural turnout gear. *Id.* All NFPA 1971-compliant turnout gear sold between 2009 and 2021—the relevant period—was made with textiles containing some form of PFAS. *Id.* ¶ 20.

The Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA") administer the Assistance to Firefighters Grant ("AFG") Program, which provides financial assistance to fire departments for the purchase of critical equipment, such as turnout gear. *Id.* ¶¶ 25–26. The AFG Program aims to "reduce the Nation's losses cause by fire through better fire prevention and control." *Id.* ¶ 26. All turnout gear purchased using funds from the AFG Program must be NFPA 1971-compliant. *Id.* ¶ 27. Thus, during the relevant period, any turnout gear purchased with AFG funding necessarily contained some form of PFAS.

In 2016, 2019, 2021, and 2022, the City of Virginia Beach and the Virginia Beach Fire Department received some funding through the AFG Program. *Id.* ¶ 31. Morning Pride alleges that the City of Virginia Beach and the Virginia Beach Fire Department used this funding to purchase Morning Pride turnout gear through a

11

distributor. *Id.* ¶ 32. Because those purchases were made with funding from the AFG Program, Morning Pride contends that the City of Virginia Beach and the Virginia Beach Fire Department were required to purchase NFPA 1971-compliant turnout gear—that is, turnout gear containing PFAS. *Id.* ¶ 33.

Separately, at various points in time, the City of Virginia Beach operated under at least four agreements to provide firefighting services to the United States Military. *Id.* ¶ 34; *see* Notice of Removal Ex. B, ECF No. 1-2 (Mutual Aid Fire Fighting Assistance Agreement Naval Air Station Oceana & City of Virginia Beach, dated August 18, 1983); Notice of Removal Ex. C, ECF No. 1-3 (Mutual Fire Fighting Assistance Agreement Fleet Combat Training Center, Atlantic, Dam Neck & City of Virginia Beach, dated October 4, 1990); Notice of Removal Ex. D, ECF No. 1-4 (Memorandum of Understanding Between the Naval Amphibious Base, Little Creek, Norfolk, Virginia for NAVPHIBASE LCREEK Annez, Camp Pendleton Virginia Beach, Virginia & City of Virginia Beach Department of Fire Protection); Notice of Removal Ex. E, ECF No. 1-5 (U.S. Coast Guard Hampton Roads Maritime Firefighting Contingency Plan, dated August 30, 2010). Under these agreements, which were in place during the relevant period, the City of Virginia Beach and the Virginia Beach Fire Department agreed to provide personnel and equipment to respond to fires on federal property. Notice of Removal ¶ 40, ECF No. 1. As part of the normal course of their firefighting duties, the Firefighter Plaintiffs and the Decedents could have been called upon to provide firefighting services for the federal government under these agreements. *Id.* ¶ 83.

12

In sum, Morning Pride contends that: (1) the City of Virginia Beach and the Virginia Beach Fire Department purchased Morning Pride turnout gear through a distributor; (2) those purchases were funded by the AFG Program, which is administered by DHS and FEMA; (3) the use of AFG funding required compliance with NFPA 1971; (4) all NFPA 1971-compliant turnout gear during the relevant period contained PFAS; and (5) the City of Virginia Beach and the Virginia Beach Fire Department used Morning Pride's turnout gear to provide firefighting services to the federal government under its agreements with the United States Military. *Id.* ¶ 42.

### C.    Morning Pride Was Not "Acting Under" a Federal Officer

Morning Pride argues that it is a person[8] "acting under" federal officers for three reasons: (1) the "acting under" standard does not require direct contractual privity, Resp. Opp'n at 16–18;[9] (2) Morning Pride was subject to federal guidance and control because its turnouts were purchased with "FEMA-provided AFG funding," *id.* at 18–26; and (3) Morning Pride's manufacture of turnout gear assisted the federal government in carrying out federal duties, *id.* at 26–29. The Court addresses each argument in turn.

---

[8] The parties do not dispute that Morning Pride is a "person" under the federal officer removal statute. *See generally* Mem. Supp., ECF No. 23; *see also* Resp. Opp'n at 16 n.4, ECF No. 29 (citing *Papp*, 842 F.3d at 812 (noting that the term "person" in § 1442(a)(1) includes "corporations, companies, associations, firms, [and] partnerships.")).

[9] This Order utilizes ECF-generated pagination.

1. *It is Undisputed that the "Acting Under" Standard Does Not Require Direct Contractual Privity*

First, Morning Pride argues that the "acting under" language "sets a broad, liberal standard" that does not require direct contractual privity. Resp. Opp'n at 16–18, 20–22, ECF No. 29. The Fourth Circuit has indeed made clear that a private party need not have a direct contractual relationship with the federal government to satisfy this requirement. *Express Scripts*, 996 F.3d at 254. Here, Morning Pride had no such direct relationship. Instead, it sold turnout gear to a distributor, which in turn contracted with the City of Virginia Beach and the Virginia Beach Fire Department. Those entities received some federal funding—during only four years of the relevant period—which was allegedly used to purchase Morning Pride turnout gear. In any event, the absence of a direct contractual relationship, standing alone, does not preclude a finding of federal officer jurisdiction.[10]

2. *Morning Pride Was Not Subject to Federal Guidance and Control*

In the absence of a direct contractual relationship, the Court considers the nature of the relationship between Morning Pride and the federal government, including whether the federal government exercised subjection, guidance or control over, or

---

[10] Morning Pride blends its discussion of this legal standard with a factual argument that "federal contractual relationships are a core component of Morning Pride's grounds for removal." Resp. Opp'n at 17, ECF No. 29 (collecting cases holding that private contractors acted under a federal officer). However, because Morning Pride does not have a *direct* contractual relationship with the federal government, the Court addresses the nature of Morning Pride's relationship with the federal government below.

implicitly delegated authority to, Morning Pride.[11] *See Watson*, 551 U.S. at 151; *see also Express Scripts*, 996 F.3d at 254 (in the absence of a direct contractual relationship, looking at the "nature of the relationship" between the private party and the federal government, including whether the private party was carrying out the duties of the government and subject to the government's guidance and control); *Agyin v. Razmzan*, 986 F.3d 168, 178 (2d Cir. 2021) (finding that Razmzan was "acting under" a federal officer in the absence of a direct contractual relationship because "he performed work that, absent the program in which he participated, the government would have had to perform itself; his work assisted the mission of the federal agency that oversaw his work; and he was subject to federal oversight and control"); *Cedars-Sinai Health Sys.*, 106 F.4th at 914 ("Something more must be present, like the

---

[11] Morning Pride asserts that "[t]here is no requirement that Morning Pride show a delegation of authority outside of the contractual relationship it asserts." Resp. Opp'n at 22, ECF No. 29. This misapplies the law to the facts at hand. It is undisputed that Morning Pride lacked a *direct* contractual relationship with the federal government. While such a relationship is *not strictly required*, as discussed *supra*, its absence requires the Court to further examine the nature of the relationship between Morning Pride and the federal government to determine, *inter alia*, whether Morning Pride acted under the direction or control of a federal officer beyond mere compliance with federal law or regulations.

The cases cited by Morning Pride do not compel a different result. In both cases, the private party had a direct contractual relationship with the federal government. *See id.* (citing *Isaacson*, 517 F.3d at 137 and *Smith v. Collection Techs., Inc.*, No. 2:15cv6816, 2016 WL 1169529, at *3 (S.D. W. Va. Mar. 22, 2016)). In *Isaacson*, the private party "contracted with the Government to provide a product that the Government was using during war . . .." 517 F.3d at 137. In *Smith*, the private party operated under a contract with the Department of Education, through which "it received delegated authority from the DOE to carry out collection activities on the agency's behalf." 2016 WL 1169529, at *3. Because those cases involved direct contractual relationships that expressly delegated federal authority, the courts had no need to look beyond the contracts to identify additional indicia of delegation. Here, by contrast, no such contract or explicit delegation exists.

delegation of legal authority, which might include evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement." (citation modified))[12]; *BJC Health Sys.*, 89 F.4th at 1043 (holding that a private party acts under a federal officer when it performs a "basic governmental task" which involves a "delegation of legal authority" from a federal entity, thereby enabling it to act "on the government's behalf").

### a. Morning Pride Cannot Evade the Relevant Inquiry by Casting Itself as a Subcontractor

First, Morning Pride urges the Court to treat it as a government subcontractor. It asserts that the City of Virginia Beach and the Virginia Beach Fire Department effectively contracted with the federal government by agreeing to receive AFG

---

[12] The Ninth Circuit has developed a non-exhaustive list of factors to consider in determining whether a private party is acting under a federal officer:

> Among other things, the Court considers whether the person is acting on behalf of the officer in a manner akin to an agency relationship. The Court also considers whether the person is subject to the officer's close direction, such as acting under the "subjection, guidance, or control" of the officer, or in a relationship which "is an unusually close one involving detailed regulation, monitoring, or supervision." Third, the Court considers whether the private person is assisting the federal officer in fulfilling "basic governmental tasks" that "the Government itself would have had to perform" if it had not contracted with a private firm. Finally, taking into account the purpose of § 1442(a)(1), the Court has considered whether the private person's activity is so closely related to the government's implementation of its federal duties that the private party faces "a significant risk of state-court 'prejudice,'" just as a government employee would in similar circumstances, and may have difficulty in raising an immunity defense in state court.

*Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) (citation modified). The Fourth Circuit has not adopted this test or developed its own list of factors to consider in evaluating this factor.

funding. Resp. Opp'n at 18, ECF No. 29. On that basis, it contends that the City of Virginia Beach and the Virginia Beach Fire Department should be treated as a federal "contractors," emphasizing that DHS imposed conditions on the receipt of AFG funds, including compliance with NFPA 1971. *Id.* Extending that logic, Morning Pride characterizes itself as a subcontractor, purportedly subject to federal guidance and control.

But this framing stretches the concept too far. The relevant inquiry is not whether Morning Pride can trace an attenuated, subcontractor-like relationship[13] to DHS or FEMA. Nor is the mere existence of a contractual relationship—direct or indirect—sufficient to satisfy the "acting under" requirement.[14] Rather, the Court must examine the nature of the relationship between Morning Pride and the federal government, including whether Morning Pride was assisting the government in carrying out its duties under federal direction or control.

---

[13] As Morning Pride effectively concedes, it is neither a federal contractor nor a federal subcontractor. Resp. Opp'n at 21, ECF No. 29. The majority of cases it relies upon throughout its opposition brief, each involving an explicit delegation of federal authority through a contractual relationship, are therefore inapposite. Morning Pride does not identify a single case in which the "acting under" requirement was satisfied based on an attenuated, subcontractor-like relationship of the sort alleged here. Nor has the Court located any such authority in its independent review.

[14] Even when a direct contractual relationship is at issue, it still must be established that the relationship is "an unusually close one involving detailed regulation, monitoring, or supervision." *Express Scripts*, 996 F.3d at 251 (quoting *Watson*, 551 U.S. at 152).

17

> b.    *The Federal Government Did Not Exercise Any Subjection, Guidance, or Control over Morning Pride*

Second, Morning Pride argues that, through the AFG Program, FEMA set design specifications that Morning Pride was required to follow. Resp. Opp'n at 19–20, ECF No. 29 ("*FEMA* set the design specifications that Morning Pride was required to follow."). This argument fails. Even assuming arguendo that Morning Pride's turnout gear was purchased through a distributor using AFG funds, Morning Pride cannot show that it produced NFPA 1971-compliant gear *pursuant to* any directive from DHS or FEMA. Compliance with NFPA 1971 alone does not amount to "acting under" DHS or FEMA.

Morning Pride manufactured and distributed PFAS-containing turnout gear to a distributor. By its own admission, it manufactures turnout gear from PFAS-containing textiles "to achieve performance characteristics such as resistance to water, oil, and chemicals."[15] Notice of Removal ¶ 15, ECF No. 1. Morning Pride now contends that it was "acting under" FEMA's direction by designing turnouts that complied with NFPA 1971, because the AFG Program required that turnout gear purchased with grant funding meet that standard. It further notes that the City of Virginia Beach and the Virginia Beach Fire Department, at times during the relevant period, received federal grant funding through the AFG Program.

---

[15] It is of no import that Morning Pride turnout gear is customized and built to order for the firefighter who will wear it. Resp. Opp'n at 20, ECF No. 29 (citing Notice of Removal ¶ 16, ECF No. 1). Irrespective of any such customization, Morning Pride states that its turnout gear was made with textiles containing PFAS. Notice of Removal ¶ 15, ECF No. 1.

18

These allegations do not establish the requisite "subjection, guidance, or control" by the federal government. *Watson*, 551 U.S. at 151. FEMA did not provide any specific design specifications to Morning Pride or its distributor.[16] Instead, FEMA provided funding conditions to fire departments—conditions that apply only if a fire department elects to use AFG funds. Those conditions do not require purchases from any particular manufacturer, nor do they direct manufacturers to design or produce specific products. At most, Morning Pride chose to manufacture NFPA 1971-compliant turnout gear to enhance the marketability of its products, not because it was "authorized to act with or for [FEMA and DHS] in affirmatively executing duties . . . under federal law." *Id.* (quoting *City of Greenwood*, 384 U.S. at 824). Such compliance is insufficient to satisfy the "acting under" requirement.

Nor is the mere provision of federal funding enough. Courts have consistently held that a private entity is not acting under a federal officer simply by receiving federal funds, even when subject to extensive federal regulations. *See, e.g., Mays*, 871 F.3d at 444–45 (rejecting federal officer removal where the defendant received federal funding); *Cedars-Sinai Health Sys.*, 106 F.4th at 917–18 (same); *Mohr*, 93 F.4th at 105 (same); *BJC Health Sys.*, 89 F.4th at 1044–47 (same).

This case lacks the type of close, detailed federal supervision required for federal officer removal—such as where the government directs the design, production, or execution of specific goods or tasks. Here, there is no allegation that FEMA or DHS

---

[16] Notably, Morning Pride has provided no affidavit or declaration indicating that it received any directive or oversight from the federal government regarding its manufacturing of turnout gear.

dictated the use of PFAS in Morning Pride's turnout gear or otherwise exercised any authority over Morning Pride's manufacturing of turnout gear. The AFG Program merely provided funding criteria and left purchasing decisions to local fire departments. Accordingly, FEMA and DHS did not exert the degree of guidance or control necessary to bring Morning Pride within the scope of the federal officer removal statute.

> 3.    *At Best, Morning Pride's Manufacture of Turnout Gear Constitutes Compliance with Federal Policy While Operating Its Own Business*

Finally, Morning Pride asserts that it assisted the federal government in carrying out two distinct federal interests. The Court addresses each in turn.

> a.    *FEMA's Stated Mission*

First, Morning Pride asserts that it "assisted FEMA in fulfilling its stated mission to 'Strengthen National Preparedness and Resilience' and 'reduce the Nation's losses caused by fire through better fire prevention and control.'" Resp. Opp'n at 26, ECF No. 29. As discussed *supra*, because Morning Pride lacks the requisite relationship with the federal government, its furthering of a federal policy is not enough. Rather, this constitutes *compliance* with a federal policy, which is not sufficient to bring Morning Pride within this statute. *See, e.g., Mohr*, 93 F.4th at 105 (rejecting federal officer removal where the defendant received incentive payments from the federal government to operate a patient portal but failed to show that it was operating that portal "*on behalf of* the government").

20

### b.    *Military Contracts*

Second, Morning Pride asserts that its turnout gear assisted the United States Military in responding to fires on military bases. Resp. Opp'n at 27, ECF No. 29. This too is insufficient. Even assuming arguendo that the Firefighter Plaintiffs and Decedents did actually wear Morning Pride's turnout gear while responding to fires on military bases, the turnout gear was not specifically contracted for in order to serve this federal purpose. It was the City of Virginia Beach that contracted with the United States Military, not Morning Pride, and Morning Pride is not a "subcontractor" in these agreements. Nor did the United States Military, through these agreements, provide any type of "subjection, direction, or control" over Morning Pride's manufacturing of turnout gear.

Further, there is no argument that absent Morning Pride's manufacturing of this turnout gear, that the federal government would have had to create this product on their own. *See Papp*, 842 F.3d at 813. Rather, this could be fairly characterized as the sale of "standardized consumer products," which does not implicate the federal officer removal statute. *Express Scripts*, 996 F.3d at 251.[17]

---

[17] The cases cited by Morning Pride are inapposite. Resp. Opp'n at 28, ECF No. 29 (citing *Sawyer*, 860 F.3d at 255; *Papp*, 842 F.3d at 813; *Isaacson*, 517 F.3d at 137):

In *Sawyer*, the defendant had manufactured boilers for use aboard U.S. Navy vessels pursuant to a contract with the Navy. 860 F.3d at 252. The defendant company "designed [its] boilers to match highly detailed ship specifications and military specifications provided by the Navy, and . . . deviations from these specs were not [permitted]." *Id.* at 253. The Navy exercised "intense direction and control" over all written documentation delivered with its naval boilers. *Id.*

In *Papp*, the defendant, while working under a federal contract, produced a military aircraft that the government needed and would otherwise have been forced to produce on its own. 842 F.3d at 813. The aircraft was manufactured under the

21

\*    \*    \*

In sum, Morning Pride cannot establish that it was "acting under" a federal officer when it manufactured the turnout gear at issue. Accordingly, the Court finds that removal was improper under § 1442(a)(1) and remands the case to state court.[18]

## IV.    CONCLUSION

For the foregoing reasons, the Motion to Remand (ECF No. 22) is **GRANTED**.[19] The Motion to Stay (ECF No. 40) is **DENIED as moot**. The above-

---

direct supervision, control, order, and directive of federal government officers, and that control extended to the content of written materials and warnings associated with such aircraft. *Id.*

In *Isaacson*, the defendants contracted with the government to produce Agent Orange, a product used by the government during the Vietnam War. 517 F.3d at 137. The Government controlled the method of formulation and "commercially available products did not contain the Agent Orange herbicides in a concentration as high as that found in Agent Orange." *Id.* at 138.

By contrast, here, Morning Pride did not have a direct contractual relationship with the federal government, and it did not produce turnout gear under a close relationship with the government, involving any type of oversight or direction.

[18] Because the Court concludes that Morning Pride has not satisfied the "acting under" prong required to support federal officer removal, and that remand is appropriate, the Court need not address the remaining two requirements of federal officer removal—whether (1) Morning Pride has a colorable federal defense and (2) there is a nexus between the charged conduct and the federal authority.

[19] To the extent that Plaintiffs seek attorney fees incurred as a result of the removal, the Court declines to award such fees. After remanding the case, the Court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). "Absent unusual circumstances, courts may award attorney[] fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). "[W]hen an objectively reasonable basis exists, fees should be denied." *Id.* The questions involved in this case were complex, and the Court believes it was reasonable for Morning Pride to seek removal under § 1442(a)(1). *See Common Cause v. Lewis*, 956 F.3d 246, 257 (4th Cir. 2020) (holding that a defendant can have "an objectively reasonable—though weak and ultimately

22

captioned case is **REMANDED** to the Circuit Court for the City of Virginia Beach.

The Clerk is **DIRECTED** to close this action and to forward a copy of this Order to

all counsel of record.

       **IT IS SO ORDERED.**

               /s/
Arenda L. Wright Allen
United States District Judge

March 24, 2026
Norfolk, Virginia

---

unsuccessful—basis for seeking removal."). Thus, the Court declines to award attorney fees incurred in litigating removal.